BOARD OF COUNTY COMMISSIONERS OF TETON COUNTY, Wyoming, Appellant (Respondent-Appellee),

Roger Parrott and Gordon Reno, Appellants (Intervenors),

v.

TETON COUNTY YOUTH SERVICES, INC., Appellee (Petitioner-Appellant).

No. 5597.

Supreme Court of Wyoming.

Oct. 21, 1982.

Rehearing Denied Dec. 15, 1982.

Henry C. Phibbs, II, Jackson, for Board of County Com'rs.

Warren W. Dill, Jackson, for intervenors.

Lawrence B. Hartnett, Jackson, for appellee.

Before ROSE, C.J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

THOMAS, Justice.

The troublesome problem to be resolved in this case is that of balancing a meaningful review by the judicial branch of government with the prerogative of a board of county commissioners to manage its own affairs. Acting pursuant to the Teton County Comprehensive Plan and Implementation Program[1] (hereinafter referred to as the Plan), which was approved by this court in *Snake River Venture v. Board of County Commissioners, Teton County,* Wyo., 616 P.2d 744 (1980), the Board of County Commissioners of Teton County (hereinafter referred to as the Board) denied an application for a development permit submitted by Teton County Youth Services, Inc. (hereinafter referred to as Youth Services). Youth Services sought review of that action in the district court, and the district court in a rather comprehensive Order Remanding Case to Agency held that the decision of the Board was not in accordance with law; was contrary to constitutional right and power; was in excess of statutory jurisdictional authority and limitations and lacking in statutory right; was entered without observance of procedure required by law; was not made upon a valid criteria; was unsupported by substantial evidence; and was arbitrary, capricious and characterized by an abuse of discretion. The district court therefore remanded the case to the Board for further proceedings consistent with the opinion and order after commenting that there appeared to be no basis to conclude that the applicant did not meet the requirements of the Plan and that under those circumstances the statute granting

---

1. The Teton County Comprehensive Plan and Implementation Program was adopted pursuant to the provisions of § 18-5-201, W.S.1977, which provides as follows:

   "To promote the public health, safety, morals and general welfare of the county, each board of county commissioners may regulate and restrict the location and use of buildings and structures and the use, condition of use or occupancy of lands for residence, recreation, agriculture, industry, commerce, public use and other purposes in the unincorporated area of the county. However, nothing in W.S. 18-5-201 through 18-5-207 shall be construed to contravene any zoning authority of any incorporated city or town and no zoning resolution or plan shall prevent any use or occupancy reasonably necessary to the extraction or production of the mineral resources in or under any lands subject thereto."

the zoning authority required the granting of a certificate. We shall affirm the action of the district court in remanding the case to the Board of County Commissioners of Teton County, but in so doing we will depart from the provisions of the district court's Order Remanding Case to Agency which strongly indicate that the Board of County Commissioners of Teton County is required to grant the permit. Instead we will require as a remedy that a contested-case-style hearing be held in order that a record adequate for a meaningful judicial review may be developed.

Early in 1980 Youth Services leased a 24.5-acre tract of land, together with the improvements and buildings located thereon, situated approximately twelve miles south of Wilson, Wyoming, in Teton County, in an area known as Redtop Meadows Subdivision. Youth Services leased this property for the purpose of providing an alternative residential treatment center for the care and treatment of juveniles found to be in need of supervision or emotionally and socially handicapped. It would appear that children exhibiting serious delinquent behavior would not be eligible for admission into the facility. Prior to the lease to Youth Services this property had been used as a boys' ranch for a number of years. Under the plans developed by Youth Services the number of juvenile residents of the facility would be limited to twelve and there would be supervision by trained adults on a 24-hour basis. The use proposed by Youth Services did not require any additional construction because the existing improvements and buildings were adequate for its needs according to its plans.

On February 25, 1980, acting through Katie Thompson, as its agent, Youth Services filed an application for a development permit with the County Administrator of Planning Services. This was the initial step necessary to obtain county approval of the planned use by Youth Services in accordance with the Plan.

The Plan requires that applications for a development permit such as this undergo a two-stage review at the county level.[2] The application first is reviewed by the County Planning Commission, which must review the application, supporting material and the report submitted by the County Administrator for Planning Services, in addition to holding a public review of the application after publication of a notice of such public meeting. Within thirty days after its review, the Commission is to submit a recommendation to the Board, which takes into account the required findings and considerations contained in the Plan. The application then is presented to the Board, which has the power to grant the permit as requested, grant the permit subject to such modifications and conditions as the Board deems necessary, or deny the permit.

The Commission and the Board, in considering any application, are to be guided by the following criteria:

"Section 8. *Required Considerations.* The following considerations shall be taken into account in the review of a development permit application by the Planning Commission and the Board of County Commissioners:

"a. Conformity with applicable goals and policies of the Comprehensive Plan.

"b. Potential effects on air quality and water quality.

"c. Potential effects on population growth and distribution.

"d. Potential effects on utilities, schools, parks and recreation facilities, and other public facilities.

"e. Potential effects on fire safety.

"f. Potential effects on traffic, with particular reference to noise, congestion,

2. This procedure is not required when a development permit application is clearly in compliance with all development permit regulations. In such a case the application is screened by the Administrator of Planning Services, who notifies adjoining landowners of the review of the application before the Board of County Commissioners. The application, together with the Administrator's recommendation, is submitted to the Board for its action. Upon approval by the Board, the Administrator issues the permit without the necessity of a public review. (Plan, Ch. VI, § 4).

automotive and pedestrian safety and convenience, traffic flow and control, vehicle maneuverability, and snow removal.

"g.   Potential effects on the character of the area in which the use is to be located, including possible intrusion on privacy in residential areas, and the scale and bulk of the use in relation to neighboring uses.

"h.   Potential effects on the County's scenic resources.

"i.   Potential effects on wildlife habitats, wildlife migration routes, and fisheries.

"Section 9.   *Required Findings.*   Before recommending or granting a development permit, the Planning Commission and the Board of County Commissioners shall make the following findings:

"a.   The proposed use does not conflict with goals and policies of the Comprehensive Plan.

"b.   The proposed use is consistent with the Land Use Element.

"c.   The proposed use will meet required performance standards.

"d.   The proposed use will conform with applicable environmental district regulations.

"e.   The proposed use will not have a significant adverse impact on air quality or water quality.

"f.   Existing utilities and public facilities are adequate to serve the proposed use.

"g.   The proposed use will not cause traffic congestion or safety hazards.

"h.   The proposed use will not interfere significantly with traffic flow, vehicle maneuverability, or snow removal.

"i.   The proposed use will not have any significant adverse impact on neighboring properties that are either developed or undeveloped.

"j.   The proposed use will not have any significant adverse impact on the County's scenic resources.

"k.   The proposed use will not significantly adversely affect wildlife with respect to the site's vegetation or water resources in supplying food, water, cover, nesting, or other needs of wildlife.

"l.   No element of the proposed use, including buildings, drives, pedestrian walkways, and recreation areas, will intrude on watercourses, bogs, lakes, or other areas that are critical wildlife habitats.

"m.   No element of the proposed use will intrude on or present a barrier to wildlife migration, movement, routes, calving, fawning, or nesting areas.

"n.   Development will be limited to those portions of the site having the least wildlife habitat value.

"o.   The physical configuration of the development will be such that it does not encircle any areas of high wildlife habitat value.

"p.   Developed and open space areas are designed to retain and enhance existing and potential wildlife habitats.

"q.   The proposed use will not interfere with existing agricultural water rights, and provision has been made to ensure access to agricultural water supplies for maintenance."

On April 7, 1980, the County Planning Commission approved the application of Youth Services subject to certain conditions.   The recommendation of the County Planning Commission then was forwarded to the Board for its consideration.   Pursuant to a public notice of a hearing on this application before the Board which was published in the official county newspaper on April 10, 1980, the matter first was presented to the Board at its regular meeting on April 22, 1980.   Following presentations on behalf of Youth Services and by opposing landowners in the area, the matter, after discussion, was tabled until further research of certain specified questions could be done.   At its Board meeting on May 20, 1980, the Board unanimously voted to deny the permit.   The proceedings before the Board are reflected in its minutes of April 22, 1980, May 6, 1980, May 20, 1980, and June 3, 1980.   The relevant parts of the minutes of those meetings which are contained in the record follow:

Minutes of Meeting of April 22, 1980:

"1.   Katie Thompson, Agent—Development permit for residential treatment

center located on tract C Redtop Meadow Subdivision, approximately 12 miles south of Wilson. Holly Dill gave the review and background of the proposed project. Staff and Planning Commission recommended approval with conditions:

"1. Limit to 12 children.

"2. Review yearly of the permit. Also consideration of fire and police protection.

"Claire Smith spoke for the project and explained several of the concerns. The children would be referred to the center by School Districts and Social Services. Clair [sic] read the attached letter to the group present. Don Moyer stated the Ranch was built for kids. Sandy Shuptrine spoke in favor of the project. Roger Parrott, representing several landowners in the area, spoke in opposition of the project. Roger read the attached letters. Mr. Parrott gave the group information on his background and then made a presentation on the reasons for his request for denial of the permit. One of the points brought out by Mr. Parrott was that the 'grant application' differs from the treatment center's application for a permit. Gordon Reno also spoke in opposition of the facility. One of his points being how the County could control the number accepted in this program. John Restin and John Lippold both spoke on the road conditions in this area. Ambulance service would not be available on any roads where they might get stuck. Roger Millward spoke for the Sheriff's Office regarding the emergency services and the County not being able to answer these calls. Under the criminal Justice portion of the program Roger stated there was a definite need for this type of facility. Muffy asked about a special Deputy in the area. Roger explained several problems with the suggestion. Ken Sutton, Fire Marshall, stated the Fire Dept. from Wilson made a trial run Sunday. The truck used made it in 24 minutes. This was done under excellent road conditions. Ken also stated he needed the State Fire Marshall's inspection report. Clair [sic] responded to Ken's re-

quests and explained the reasons he hadn't received the report at this time. Jerry asked Sandy Z, Deputy County Attorney, if the County could limit the number of children. Sandy stated he felt we could put the limit at a certain number but if the Judge requested another child be admitted he didn't know what the outcome would be. Further discussion on the type of child the center would be enrolling followed. Max asked several questions regarding the program. Jerry asked if other counties were considered for the site. Clair [sic] said they looked at property in Bondurant but the staff is located in Jackson and she personally did not want to move to another area to provide this service. Jerry further questioned Clair [sic] about the numbers of children she felt the program could handle. Clair [sic] stated the facility could only handle twelve children. The average stay for a child would be one year. Muffy made statements regarding the impact on the neighbors, services problems, and the number of children. She stated going over the letters it looked like there are already 20 children who need the program. Jerry also stated that the number of kids was also his concern with the facility. Jerry thought the total need for the four counties should be researched. It should be looked into to see if a legal limit can be placed on the facility. Further discussion held on the number. Max felt there should be additional study of the program. Max moved to table until the following questions could be researched:

"1. Limiting the numbers.

"2. Needs of the other counties.

"3. Additional research on sites.

"4. Costs of the services problems.

"Seconded by Muffy. Motion carried."

Minutes of the Meeting of May 6, 1980:

"OLD BUSINESS

"1. Katie Thompson, Agent, Development permit for residential treatment center. Located on Tract C of Redtop Meadows Subdivision, 12 miles south of

Wilson. Larry Hartnett, Board member and Legal council [sic] for the VanVleck House, requested the hearing be continued until the next meeting, May 20, 1980. Mr. Hartnett's request was based on a conflict of interest with the County's counsel. Discussion followed.

"Max moved, seconded by Muffy to approve the request and to let the center continue to operate for the two week period. Motion Carried."

"OFFICIAL PROCEEDINGS OF THE BOARD OF COUNTY COMMISSIONERS, TETON COUNTY, WYOMING.

"The Board of County Commissioners met, Tuesday, May 20, 1980 at 9:00 A.M. in the City Council room of the courthouse.

"PRESENT: Jerry L. Tracy, Chairman, Muffy Moore, J. Max May, members, Jolynn Coonce, Clerk, Paul Vaughn, Deputy County Attorney, Dan Cowee, Adm. of Planning Service, Holly Dill, Assistant.

"Minutes of the previous meeting were approved by the Board.

"1. Katie Thompson, agent, Development permit for Residential Treatment Center, located on Tract C Redtop Meadows Subdivision. Larry Hartnett, representing the center, made an opening statement to the Board. Claire Smith read the attached letter. The letter clarified information the Board had requested. She also gave a review of why the proposed site was selected. Don Harger, a new member of the Board of the VanVleck House, gave his comments in support of the proposal. He mentioned that the applicants had been told in the beginning that a permit was not necessary. Mr. Harger stated that this was the reason that the school is now in violation. The Board and Claire had a discussion about the number of kids the center could handle and how the decision of which kids to accept would be made. Larry Hartnett gave the Board further information on the question of selection. John Thorn also made comments on selection procedures.

"General discussion was held on the impact of the Center on the neighborhood. Larry Hartnett suggested that the Board limit the permit to the 12 requested. Jerry stated that he had talked with Judge Ranck about limiting the permit. The Judge stated that he would cooperate with the Board's request, but the needs for the Center were a problem. Terry Rogers told the Board that he did not feel the Court could change the permit as granted by the Commission. Further discussion on 12 being the proper number for the Center and the impact on the neighborhood. VanVleck people explained that the proposed site, money available, type of service, and treatment limited the number to 12. Muffy asked if the program is a great success, isn't there always the possibility of the State giving additional funds to expand the buildings and facilities to accomodate [sic] more people. Again the VanVleck group explained the need to keep the program small to be able to achieve the results that the program is designed for.

"Roger Parrott, a resident of Redtop Meadows, gave his comments opposing the project in the Redtop area. Roger gave the Board a copy of the grant application and pointed out the irregularities. He also read the attached letter.

"Gordon Reno asked about the Menninger Foundation and how it operates. Further discussion was held on the facility and the numbers of kids it could handle. At this point the Board took a ten minute break.

"After the break each member expressed his and her opinions. Muffy asked Terry Rogers if there were any legal considerations the Board should take into account in making a decision. Terry stated they should just follow the planning process and Master Plan requirements.

"Muffy listed the following reasons for denying the permit:

"1. All of the discussion on the adverse impact is evidence that it exists.

"2. By allowing the permit you would be establishing a claim in the neighborhood.

"3. No guarantee of the number of kids at the Center can be given.

"4. The lack of fire, police and medical facilities mentioned by Jerry.

"Max then gave the following statement: 'I firmly believe in the old law as originally written, You can do with your property as you see fit as long as you do not de-value your neighbor's property in any way. That is, morally, mentally or physically. The property owners have shown by their petition that they feel there is a devaluation. This represents the majority of the people.'

"Larry Hartnett requested that the Board make available their findings of fact and reasons for denial of the permit. He stated that the decision will be appealed by the VanVleck Board.

"Muffy moved, seconded by Max to deny the permit for the above reasons and to work out the finds that Larry requested with the Board's attorney. Motion carried."

In connection with the approval of the minutes of the Board meeting held on May 20, 1980, at the Board meeting on June 3, 1980, Commissioner Muffy Moore submitted the following addition for the purpose of clarifying her statement on the Redtop Meadow Treatment Center:

"1. In order to issue a development permit, there must be no significant adverse impact on neighboring properties, developed or undeveloped. (Finding i, Sec. 8.) The applicant apparently admits the adverse impact of a larger facility but contends that a facility restricted to 12 kids will have no such impact. I agree with the neighbors that there will be a significant adverse impact from placing even as few as 12 delinquent children in a remote rural neighborhood, but in any case all seem to admit the likelihood of adverse impact and whether it would begin at 6, 12, or 20 children cannot be determined.

"2. There is no way to guarantee that the number of delinquents treated at the center will be limited to 12.

"3. Once the facility is placed there, they will have the same right to expand and grow in that neighborhood as the present residents do. It would not be possible or fair to limit their future growth once they are established there.

"4. Section 8, # F. Existing utilities and public facilities are not adequate to serve the proposed use. (Refer to testimony of police, fire, etc.)

"5. The proposal is in conflict with policy # 4, which states, 'Visitor accommodations except for dude ranches, should be concentrated in Jackson and vicinity, in Teton Village, and a few appropriate points along highway approach routes.'"

The Findings of Fact, Conclusions and Order of the Board of County Commissioners, entered on June 3, 1980, state in pertinent part as follows:

"1. That on or about February 25, 1980, applicant filed her application for a development permit with the Planning Office, said application being number 154.

"2. That the application was for a development permit to develop a residential treatment center housing twelve people of the ages of 12–18 years old along with teachers and counsellors, the requested development to be in Tract C of the Redtop Meadow Subdivision, Teton County, Wyoming, consisting of 24.5 acres in land use districts classified primarily RA–3 and a small portion being classified RA7.5.

"3. That a small portion of the requested development would be in an environmental protection district classified as a Hillside Protection District, and the remainder of the requested development area is not in an environmental protection district.

"4. That public notice of a hearing on said application before the Planning Commission was published in the official County newspaper on March 6, 1980, and the matter was heard by the Planning Commission at a public hearing on April 7, 1980, at which time the Planning Commission approved the application with conditions, which conditions are set forth in Exhibit A attached hereto and made a part hereof.

"5. That public notice of a hearing on said application before the Board of

County Commissioners was published in the official County newspaper on April 10, 1980, and the matter was initially heard by the Board at a public hearing on April 22, 1980, at which time the applicant, her attorney, and members of the board of directors of the VanVleck House appeared and were heard, and statements in opposition to the permit were heard, and the Board heard from Undersheriff Roger Millward and Fire Marshall Ken Sutton, and the matter then having been tabled until the May 20, 1980 meeting in order to allow applicant to further address certain issues and to present additional supporting data to the Board.

"6. That the national standard for a fire truck to respond to a fire in an institution of the nature for which applicant seeks a development permit is seven minutes; that the minimum time in which a fire truck could reach the location of the proposed development in ideal road and weather conditions would be twenty-four minutes; that said response time would significantly be increased in times of adverse weather and road conditions; that the access road to the proposed development area is subjected to heavy snowfall annually during the months of October through April; and that because of the prevailing road conditions and the distance required to be travelled Teton County would be unable to provide adequate fire protection to the proposed development; and further that the residents of the proposed development would not be there voluntarily, but rather under court order or some other means of compelling their presence and as a result thereof Teton County is under a heavy obligation to provide adequate fire protection to them, which cannot be done.

"7. That police protection to the proposed development would have to be provided by Teton County by and through the Teton County Sheriff's Department and the response time that said department would be able to provide to the proposed development would be no better than that of the fire department and would oftentimes be worse, depending upon the location of the deputy sheriff at the time he received a call for assistance at the proposed development; that Teton County would be obligated to provide such police protection to the proposed development and that it would be unable to do so satisfactorily.

"8. That response times to the proposed development for an ambulance and/or medical personnel would be greater than for the fire department and that such a response time would be unsatisfactory for the use proposed to be developed.

"9. That there would be a significant impact upon the area in which the proposed development would be located, said impact to include a significant increase in the vehicular traffic on the roads, noise, traffic congestion, and problems caused thereby resulting in a diminution of of [sic] automotive and pedestrian safety and vehicle maneuverability and further that there would be a serious impact on road maintenance and new construction.

"10. That those persons who own property in the immediate vicinity of the proposed development are nearly unanimous in their opposition to the proposed development.

"11. That there are not adequate safeguards existing to confine the number of residents at the proposed development to twelve in number or to protect the residential character of the neghborhood [sic].

"NOW THEREFORE, based upon the foregoing findings the Board concludes that the application for a development permit should be denied, and

"IT IS, THEREFORE ORDERED that the application of Katie Thompson for a development permit be and the same is hereby denied."

Confronted with this rather sparse record in the form of minutes of the Board meetings, the district court justifiably was critical of the record that was submitted, even allowing for some augmentation in the form of handwritten notes made by one board member and an employee of the County Planning Commission who attended

the meetings. The cornerstone of the disposition made by the district court is the reliance by the judge upon the provisions of § 18–5–203, W.S.1977[3], particularly that portion that provides that the Board "shall grant certificates when the proposed construction or use complies with the requirements of the zoning resolution." The district court quoted Findings of Fact Nos. 6, 7, 8, 9, 10 and 11 which are set forth above, and noted that:

"Apparently there is *no* regulation regarding human occupation of structures within a certain distance of municipal fire protection, nor within a certain distance of permanently stationed police protection, nor outlawing increase in vehicular traffic on a road and accompanying noise and traffic congestion. Nor is there a provision that adjacent property owners may veto a proposed use in given circumstances."

The conclusion of the district court was:
"5. The decision of the Teton County Commissioners rendered May 20, 1980, and formalized into writing June 30, 1980, denying the application of appellant (by and through its agent Katie Thompson) for a zoning certificate of use: is not in accordance with law; is contrary to constitutional right and power; is in excess of statutory jurisdiction, authority and limitations, and lacking in statutory right; was entered without observance of procedure required by law as to significant underlying findings, considerations and criteria; is unsupported by substantial evidence; and is arbitrary, capricious and characterized by an abuse of discretion."

The district court also said in its Order Remanding to Agency:
"The pivotal issue then is whether the proposed use complies with the *requirements* of the zoning resolution. If the commissioners find it does comply, the state law compels them to issue the certificate; irrespective of whether the use fulfills expectations more or less subjectively reached by policy statements, or by other considerations or constraints not a substantive part of the zoning resolution."

In its order the court then provided with respect to this proposition:
"6. The statute of Wyoming which is the basis of the county commissioners' authority to act already requiring that such commissioners shall grant a zoning certificate of use when the proposed use complies with the requirements of the zoning resolutions, and the Board having not specified any aspect thereof which fails to comply with the zoning regulations in effect, the matter is returned to the county commissioners for further proceedings consistents [sic] with this opinion and order."

We agree with appellants that the only appropriate interpretation of this disposition by the district court in its Order Remanding Case to Agency is that the Board failed to demonstrate that the proposed use did not comply with the zoning regulations in effect, and it therefore, under the law, was required to issue the permit.

The Board then took an appeal from the order of the district court. In presenting the case on appeal, the Board listed some ten issues.[4] The linchpin of our disposition

3. Section 18–5–203, W.S.1977, reads as follows:

"It is unlawful to locate, erect, construct, reconstruct, enlarge, change, maintain or use any building or use any land within any area included in a zoning resolution without first obtaining a zoning certificate from the board of county commissioners and no zoning certificate shall be issued unless the plans for the proposed building, structure or use fully comply with the zoning regulations then in effect. The board of county commissioners shall act promptly upon any application filed with it and shall grant certificates when the proposed construction or use complies with the requirements of the zoning resolution. If it denies the application, the board shall specify the reasons for such denial. The decision of the board of county commissioners may be reviewed by the district court and by the supreme court upon appeal in the same manner as provided in W.S. 15–626, for review of decisions of boards of adjustment."

4. The issues as set forth in the appellants' brief are as follows:

is alluded to in the appellants' stated issue No. 10, which is:

"X. WHETHER THE APPLICATION OF THE WYOMING ADMINISTRATIVE PROCEDURE ACT TO THE JUDICIAL REVIEW OF COUNTY ZONING DECISIONS IS UNCONSTITUTIONAL AS A VIOLATION OF THE SEPARATION OF POWERS SET FORTH IN ARTICLE II, SECTION 2 OF THE WYOMING CONSTITUTION, INSOFAR AS IT PURPORTS TO GRANT CERTAIN REVIEW POWERS AND AUTHORITY TO COURTS FOR APPEALS FROM COUNTY ZONING DECISIONS."

"I. WHETHER THE DISTRICT COURT ERRED IN DETERMINING THAT THE APPELLANT BOARD OF COUNTY COMMISSIONERS HAD THE BURDEN OF PROOF BEFORE THE DISTRICT COURT TO ESTABLISH THAT THE RECORD BEFORE THE BOARD OF COUNTY COMMISSIONERS CONTAINED COMPETENT EVIDENCE TO SUPPORT THE BOARD'S DECISION, RATHER THAN DETERMINING THAT THE APPELLEE PROPERLY HAD THE BURDEN OF PROOF ON AN APPEAL FROM A COUNTY ZONING DECISION TO ESTABLISH THAT THE RECORD BEFORE THE APPELLANT BOARD CONTAINED NO COMPETENT EVIDENCE TO SUPPORT THE BOARD'S DECISION.

"II. WHETHER THE DISTRICT COURT ERRED IN FAILING TO FIND THAT APPELLEE DID NOT SATISFY ITS BURDEN OF PROOF IN PRESENTING ITS APPLICATION TO THE APPELLANT BOARD OF COUNTY COMMISSIONERS, OR ON APPEAL TO THE DISTRICT COURT.

"III. WHETHER THE DISTRICT COURT ERRED IN FAILING TO CONSIDER IN THE COURT'S DECISION AND ORDER THE REQUIRED CONSIDERATIONS AND REQUIRED FINDINGS FOR THE ISSUANCE OF A DEVELOPMENT PERMIT ESTABLISHED UNDER THE TETON COUNTY COMPREHENSIVE PLAN AND IMPLEMENTATION PROGRAM.

"IV. WHETHER THE DISTRICT COURT ERRED BY APPLYING AN IMPROPER STANDARD FOR REVIEW OF THE APPELLANT BOARD'S DECISION WHILE ACTING ON AN APPLICATION SUBMITTED UNDER ITS ZONING RESOLUTION.

"V. WHETHER THE DISTRICT COURT ERRED IN RAISING ISSUES AT THE HEARING AND IN THE COURT'S ORDER WHICH WERE NOT PRESENTED TO THE APPELLANT BOARD OF COUNTY COMMISSIONERS.

We also shall deal with the appellants' stated issues 6, 7, 8 and 9, as quoted in footnote 4 above in making disposition of this case.

Article 2, Section 1 of the Constitution of the State of Wyoming does provide:

"The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted."

"VI. WHETHER THE DISTRICT COURT ERRED BY IMPROPERLY SUBSTITUTING ITS OWN JUDGMENT FOR THE JUDGMENT OF THE APPELLANT BOARD OF COMMISSIONERS.

"VII. WHETHER THE DISTRICT COURT ERRED BY EFFECTIVELY DIRECTING THE APPELLANT BOARD OF COUNTY COMMISSIONERS TO ISSUE THE DEVELOPMENT PERMIT.

"VIII. WHETHER THE WYOMING ADMINISTRATIVE PROCEDURE ACT IS APPLICABLE TO THE JUDICIAL REVIEW OF ZONING DECISIONS MADE BY COUNTY COMMISSIONERS.

"IX. WHETHER COUNTIES, IN ADMINISTERING COUNTY ZONING RESOLUTIONS ARE SUBJECT TO JUDICIAL REVIEW UNDER THE CONTESTED CASE STANDARDS FOR REVIEW UNDER THE WYOMING ADMINISTRATIVE PROCEDURE ACT.

"X. WHETHER THE APPLICATION OF THE WYOMING ADMINISTRATIVE PROCEDURE ACT TO THE JUDICIAL REVIEW OF COUNTY ZONING DECISIONS IS UNCONSTITUTIONAL AS A VIOLATION OF THE SEPARATION OF POWERS SET FORTH IN ARTICLE II, SECTION 1 OF THE WYOMING CONSTITUTION, INSOFAR AS IT PURPORTS TO GRANT CERTAIN REVIEW POWERS AND AUTHORITY TO COURTS FOR APPEALS FROM COUNTY ZONING DECISIONS."

Youth Services disagree with these statements of the issues, and in its brief argued the sole issue to be:

"1. WHETHER, AFTER REVIEWING THE RECORD IN THIS ACTION, THE DECISION OF THE DISTRICT COURT IS CORRECT AND IN CONFORMANCE WITH THE WYOMING ADMINISTRATIVE PROCEDURES [sic] ACT, § 9–4–114 WYOMING STATUTES (1977)."

One of the functions of this court is to safeguard the integrity of the State Constitution. In this instance that means that our function, stated in a concrete manner, is that of endeavoring to provide for a meaningful judicial review of the action of the Board while at the same time avoiding any infringement upon the proper exercise by that Board of its executive function. We perceive that the direction given by the district court is an infringement upon that executive function, and consequently, while we for the most part agree with the criticism levied by the district judge and directed to the procedure followed by the Board in this instance, we conclude that the appropriate balance between the judicial function and the executive function will be achieved by affirming the action of the district court in remanding the case to the Board, but requiring that the Board then treat the matter as a contested case under the Wyoming Administrative Procedure Act, §§ 9–4–101, et seq., W.S.1977. It is only in this way that an adequate record for a meaningful judicial review can be developed before the Board, the manifestation of the executive department of government which is charged with making the decision.

The Board questions the applicability of the Wyoming Administrative Procedure Act, §§ 9–4–101, et seq., W.S.1977, to judicial review in this instance. Yet, § 18–5–203, W.S.1977, provides in pertinent part:

" * * * The decision of the board of county commissioners may be reviewed by the district court and by the supreme court upon appeal in the same manner as provided in W.S. 15–626, for review of decisions of boards of adjustment."

In our statutes, § 15–626 has evolved into § 15–1–609, W.S.1977, which provides:

"The decision of the board may be reviewed by the district court pursuant to Rule 12 of the Wyoming Rules of Appellate Procedure."

This adjustment occurred in the revision of Title 15 of our Wyoming statutes relating to cities and towns in 1980, the earlier procedure having been carried through to Title 15 amendments found in Ch. 112, S.L. of Wyoming 1965. The decision of the Board under the current statute with respect to zoning certificates is subject to review in accordance with Rule 12, W.R.A.P., which procedurally implements the review provided for in the Wyoming Administrative Procedure Act.

To that we add the proposition that in adopting the Wyoming Administrative Procedure Act, §§ 9–4–101, et seq., W.S.1977, the legislature did provide a new procedure for appeals from most administrative agency determinations. Section 9–4–114(b), W.S.1977, provides:

"(b) The supreme court's authority to adopt rules governing review from agencies to the district courts shall include but not be limited to authority to determine the content of the record upon review; the pleadings to be filed; the time and manner for filing the pleadings, records and other documents; and the extent to which supplemental testimony and evidence may be taken or considered by the district court. The rules adopted by the supreme court under this provision may supersede existing statutory provisions."

In implementation of this statutory direction, Rule 87(b) of the Wyoming Rules of Civil Procedure then provided as follows:

"(b) *Administrative procedure.*—All statutory provisions relating to procedure on appeal from or review of administrative action by district courts, including all time limitations, but not including provisions giving a right of appeal or review, are superseded, provided, that statutory provisions relating to bonds, costs and precedence or advancement on the calendar shall be directory and may be applied by the judge of the district court."

■ The conclusion we draw is that with limited exceptions Rule 12 of the Wyoming Rules of Appellate Procedure now governs the procedural aspect of review of administrative actions. *City of Evanston v. Whirl Inn, Inc.,* Wyo., 647 P.2d 1378 (1982); *Atlantic Richfield Company v. Board of County Commissioners of County of Sweetwater,* Wyo., 569 P.2d 1267 (1977); *Town of Afton, Lincoln County v. Public Service Commis-*

*sion,* Wyo., 471 P.2d 331 (1970). Rule 12 of the Wyoming Rules of Appellate Procedure indicates that review is to be accomplished in accordance with the Wyoming Administrative Procedure Act. Rule 12.09, W.R. A.P., specifically provides that the "court's review shall be limited to a determination of the matters specified in § 9–4–114(c) [W.S.1977]." Rule 12.09, W.R.A.P., also provides that:

"The court shall enter judgment affirming, modifying or reversing the order, or in its discretion, remanding the case to the agency for proceedings in conformity with the direction of the court."

Section 9–4–114(c), W.S.1977, Cum.Supp. 1982, provides as follows:

"(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

"(i) Compel agency action unlawfully withheld or unreasonably delayed; and

"(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

"(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

"(B) Contrary to constitutional right, power, privilege or immunity;

"(C) In excess of statutory jurisdiction, authority or limitations, or lacking statutory right;

"(D) Without observance of procedure required by law; or

"(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute."

■ Applying these standards, it is apparent that the decision of the Board denying the application of Youth Services for a development permit must be set aside. In its Finding No. 10 the Board found:

"10. That those persons who own property in the immediate vicinity of the proposed development are nearly unanimous in their opposition to the proposed development."

The opposition of neighbors is not one of the considerations to be taken into account pursuant to § 8 of the Plan, quoted above, nor is it encompassed within those findings which are mandated by § 9 of the Plan. Since there is no way to discern what weight the Board may have given to this unauthorized criteria in making their determination that the application for a development permit by Youth Services should be denied, it is apparent that the decision of the Board cannot stand. In concluding to reverse the case and remand it to the Board, the district court indicated with respect to this finding that the Board acted without or in excess of its powers. We add to that statement the propositions that the decision of the Board was not in conformity with law; that it was characterized by an abuse of discretion; and that it also perhaps is arbitrary and capricious.

■ Although agreeing that a remand to the Board is in order, we cannot agree with the general disposition of the matter made by the district court. Because of the obvious inadequacies of the record made before the Board, the only appropriate direction under Rule 12.09, W.R.A.P., is to remand the case to the Board so that a proper record adequate for judicial review can be developed. We cannot agree with the indicated requirement imposed by the district court that the development permit must be granted. There simply is no way that either the district court or this court can determine the propriety of the Board's action based upon the inadequate record presented for review.

We appropriate for our thesis the words of Mr. Chief Justice Hughes in *Morgan v. United States,* 304 U.S. 1, 14, 58 S.Ct. 773, 774, 82 L.Ed. 1129 (1938), reh. denied 304 U.S. 1, 58 S.Ct. 999, 82 L.Ed. 1129 (1938), mandate conformed to, D.C., 24 F.Supp. 214

(1938), reversed 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939), mandate conformed to, D.C., 32 F.Supp. 546 (1940), reversed 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941):

" * * * The vast expansion of this field of administrative regulation in response to the pressure of social needs is made possible under our system by adherence to the basic principles that the legislature shall appropriately determine the standards of administrative action and that in administrative proceedings of a quasi-judicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play. These demand 'a fair and open hearing,'—essential alike to the legal validity of the administrative regulation and to the maintenance of public confidence in the value and soundness of this important governmental process. Such a hearing has been described as an 'inexorable safeguard.' [Citations]. * * *

* * * * * *

" * * * The right to a hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one. Those who are brought into contest with the Government in a quasi-judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command." *Morgan v. United States,* supra, 304 U.S. at 18, 58 S.Ct. at 776.

This is what Youth Services was entitled to in this instance. It was entitled to receive notice of those elements of the Plan which the Board concluded inhibited the granting of the development permit. It then was entitled to receive a trial-type hearing with respect to the issues posed by the notice. If accomplished in a proper manner, the trial-type hearing will produce an adequate record for a meaningful review of the action of the Board.

■ These requirements are justified in the following ways:

1. The Wyoming Administrative Procedure Act does apply to proceedings in which a board of county commissioners denies a zoning certificate, not only with respect to the review process but also with respect to the statutory requirements for a contested case.

2. Cases decided by this court explain and justify the necessity for an adequate record in order for a meaningful review to be accomplished.

3. Due process considerations of constitutional proportions with respect to property interests demand such an approach.

We begin with the definitions of the Wyoming Administrative Procedure Act, § 9–4–101(b), W.S.1977, Cum.Supp.1982, which provide in part as follows:

"(ii) 'Contested case' means a proceeding including but not restricted to ratemaking, price fixing and licensing, in which legal rights, duties or privileges of a party are required by law to be determined by an agency after an opportunity for hearing;

"(iii) 'License' includes the whole or part of any agency permit, certificate, approval, registration, charter or similar form of permission required by law, but it does not include a license required solely for revenue purposes.

"(iv) 'Licensing' includes the agency process respecting the grant, denial, renewal, revocation, suspension, annulment, withdrawal or amendment of a license."

Further, § 9–4–113(a), W.S.1977, provides as follows:

"(a) *Notice; hearing.*—When the grant, denial, suspension, or renewal of a license is required by law to be preceded by notice and an opportunity for hearing the provisions of this act [§§ 9–4–101 to 9–4–115] concerning contested cases apply."

Finding of Fact No. 5 entered by the Board on June 3, 1980, provided as follows:

"5. That public notice of a hearing on said application before the Board of County Commissioners was published in

the official County newspaper on April 10, 1980, and the matter was initially heard by the Board at a public hearing on April 22, 1980, at which time the applicant, her attorney, and members of the board of directors of the VanVleck House appeared and were heard, and statements in opposition to the permit were heard, and the Board heard from Undersheriff Roger Millward and Fire Marshall Ken Sutton, and the matter then having been tabled until the May 20, 1980 meeting in order to allow applicant to further address certain issues and to present additional supporting data to the Board."

This finding apparently is made in accordance with the provisions of Chapter XI of the Plan relating to administration, which states in part as follows:

"Section 1. *Public Review.* When the provisions of this resolution require that a public review be held on any matter, such review shall be conducted in the following manner:

"a. Notice of the review shall be published in a newspaper of general circulation in the County not less than 10 days nor more than 30 days prior to the date of the review.

"b. Reviews shall be conducted in such a manner as to afford an applicant or petitioner and any interested party the opportunity to submit exceptions to the record, contentions, statements in support of or opposing the matter being reviewed, and arguments with respect to the issues entailed, provided that the Planning Commission and the Board of County Commissioners may limit the taking of evidence not previously submitted· and made a matter of record."

In light of the property right of Youth Services, the interest of a lessee in real property, which is involved, we hold that these provisions of the Plan bring this matter within the scope of § 9–4–113(a), W.S. 1977, as one in which "the grant * * * of a license is required by law to be preceded by notice and an opportunity for hearing * *." In such an instance the provisions of the Act relating to contested cases apply, and

the record manifests the noncompliance with those rules. It is this deficiency that forecloses a meaningful review in this case. To hold otherwise would place this court in the dilemma noted in *Battaglia v. O'Brien,* 59 N.J.Super. 154, 173, 157 A.2d 508, 519 (1960), where it is stated:

" * * * [I]n view of the unavailability of the basic records, we are in no position to determine whether there has been 'strict conformity with the procedural and substantive terms of the statute,' nor are we able to determine whether the municipal action was arbitrary, capricious or a manifest abuse of discretionary authority."

See also *Board of County Commissioners for Prince George's County v. Ziegler,* 244 Md. 224, 223 A.2d 255 (1966); *Russo v. Stevens,* 10 Misc.2d 530, 173 N.Y.S.2d 344 (1958), reversed on other grounds 7 App. Div.2d 575, 184 N.Y.S.2d 989 (1959); *DiIorio v. Zoning Board of Review of City of East Providence,* 105 R.I. 357, 252 A.2d 350 (1969); and *Loveless v. Yantis,* 82 Wash.2d 754, 513 P.2d 1023 (1973).

This court in prior cases has noted that meaningful review of administrative actions requires that an adequate record of the proceedings be made before the administrative agency. *Geraud v. Schrader,* Wyo., 531 P.2d 872 (1975); *Johnson v. Schrader,* Wyo., 502 P.2d 371 (1972); *Glenn v. Board of County Commissioners, Sheridan County,* Wyo., 440 P.2d 1 (1968). In this latter case the court said:

"A basic purpose of the act is to assure that the controverted issues underlying such a proceeding, with the exception of those matters that may be noticed under § 9–276.26(d) [§ 9–4–108(d), W.S.1977], will be fully developed and supported on the record by material and substantial evidence and upon which the agency, as the finder of fact, must adjudicate the matter. The objective, of course, is to avoid agency action upon an assumption of facts undisclosed by such evidence. Without reasonable adherence to that objective the contemplated safeguards of a direct and convenient court review, even though somewhat limited, would be frus-

trated." *Glenn v. Board of County Commissioners, Sheridan County,* supra, p. 3. This quoted language very aptly describes what occurred in this instance. The action of the Board had to be based upon an assumption of facts undisclosed by evidence before it. The district court and this court are frustrated in the effort to accomplish review.

■ The leasehold interest of Youth Services is a right of property, and this court has said in *Bulova Watch Company v. Zale Jewelry Company of Cheyenne,* Wyo., 371 P.2d 409, 417 (1962):

" * * * generally the use of property and the making of contracts shall be free of governmental interference, but neither property rights nor contract rights are absolute."

It must, of course, be recognized that, under the exercise of the police power, zoning provisions may be imposed by local governments. *Village of Euclid, Ohio v. Ambler Realty Company,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016 (1926); *Snake River Venture v. Board of County Commissioners, Teton County,* Wyo., 616 P.2d 744 (1980). Nevertheless the property interest justifies the claim of its owner to due process of law under the Fourteenth Amendment to the Constitution of the United States and Art. 1, § 6 of the Constitution of the State of Wyoming. In a case similar in nature, although one in which the appeal was taken by those opposing the use permit, the Kentucky Court of Appeals said as follows:

"We have held that procedural due process by an administrative body includes: " ' * * * a hearing, the taking and weighing of evidence if such is offered, a finding of fact based upon a consideration of the evidence, the making of an order supported by substantial evidence, and, where the party's constitutional rights are involved, a judicial review of the administrative action. * * * ' *Kentucky Alcoholic Beverage Control Board v. Jacobs,* Ky., 269 S.W.2d 189.

"Plainly, the proceedings before the Board of Zoning Adjustment on the instant case did not afford procedural due process—there was no real hearing; no taking of evidence; no finding of fact; nothing to support the order. This means that the action was arbitrary and could not properly be upheld by the circuit court. The absence of a record showing a due-process proceeding was not, as suggested by the appellee, a ground for dismissing the appeal to the circuit court, for if that were so an administrative agency could effectively forestall any judicial review of its action simply by denying a due process hearing." *Morris v. City of Catlettsburg,* Ky., 437 S.W.2d 753, 755 (1969).

See also *Carnat Realty, Inc. v. Barnett,* 33 App.Div.2d 772, 307 N.Y.S.2d 9 (1969).

The question remains, if the foregoing requirements are essential to lawful action by the Board, how these requirements are best to be met. There is as a part of this record a letter to the district court to which is attached a certified copy of the Rules of the Board of County Commissioners of Teton County relating to contested cases, which apparently were lawfully adopted. While those rules appear to impose upon a party the obligation to request a contested-case hearing, there is no inhibition upon the Board with respect to conducting such matters as contested cases on its own volition. Had this matter been conducted as a contested case, there would have been appropriate notice of the issues to Youth Services; a contested-case-style hearing with the taking of evidence under oath would have been conducted; the requirements of the Wyoming Administrative Procedure Act would have been satisfied; an adequate record for purposes of meaningful review would have been made; and the constitutional requirements of due process also would have been met.

We have not overlooked the reference to § 15–626 in § 18–5–203, W.S.1977 (quoted above in footnote 3). Section 15–1–609, W.S.1977 (quoted above at page 19), is far different from W.S. § 15–626 referred to in § 18–5–203. The statute referred to, § 15–626, was part of the municipal code which

was repealed and replaced by the current municipal code in 1965, Ch. 112, S.L. of Wyoming 1965. The provisions of that statute became a part of the laws of the State of Wyoming in 1923. Chapter 78, § 7, S.L. of Wyoming 1923. Section 15–1–609, W.S. 1977, an amendment to the 1977 statutes, was adopted in 1980 as part of a revision of Title 15 of those statutes. Chapter 38, § 1, S.L. of Wyoming 1980. The amendment had an effective date of January 1, 1981. Chapter 38, § 2, S.L. of Wyoming 1980. In the context of this proceeding that amendment became effective about midway between the filing of the Petition for Review on June 5, 1980, and the Order Remanding Case to Agency filed on August 10, 1981. The hearing on the Petition for Review did occur on September 15, 1980. Following the hearing, and prior to the entry of the Order Remanding Case to Agency, there was filed in the district court a series of pleadings consisting of memoranda, briefs and motions. Several of those were filed after January 1, 1981.

We also have in mind the usual rule that a specific reference in the statute to the provisions of another statute results in the adoption of the referenced statute as part of the statutory provision with the same effect as if it had been bodily incorporated therein. *Edwards v. City of Cheyenne,* 19 Wyo. 110, 114 P. 677, reh. denied 122 P. 900 (1911); 2A Sutherland, Statutory Construction, § 51.07 (1973). Subsequent amendments to, modifications or repeals of the referenced statute have no effect on the adopting statute in the absence of an express legislative directive or strong implication showing it was the legislature's intent to incorporate subsequent changes in the adopting statute. *Legat v. Adorno,* 138 Conn. 134, 83 A.2d 185 (1951); *State ex rel. Linthicum v. Board of Com'rs of Vanderbargh County,* 175 Ind. 400, 94 N.E. 716 (1911); *Rollins v. Town of Gordonsville,* 216 Va. 25, 215 S.E.2d 637 (1975). See also Annotation 168 A.L.R. 627, 630 (1947), and the cases cited therein; 2A Sutherland, Statutory Construction, § 51.08 (1973). The usual rule requires that in the absence of some strong legislative intent to change

the law, § 15–626, W.S.1957, remained in effect for the purposes of § 18–5–203, W.S. 1977. We note in passing that the provisions of § 15–626 are located most easily in Ch. 112, § 89, S.L. of Wyoming 1965.

The provisions of § 15–626, adopted by reference in § 18–5–203, W.S.1977, in essence provided for a review on the record by the district court, but with the opportunity to take evidence or appoint a referee to take evidence as directed by the court. The statute provided that the judgment of the court should confirm, correct, modify or annul the decision appealed from. It then went on to provide for an appeal to the supreme court. In interpreting that statute, this court concluded that the "appeal" authorized by its provisions was analogous to a trial de novo hearing from a decision of a governing board of a town or municipality with respect to the denial of a liquor license in accordance with § 12–4–104(f), W.S.1977, which recently was discussed in *City of Evanston v. Whirl Inn, Inc.,* supra. See *Williams v. Zoning Adjustment Board of City of Laramie,* Wyo., 383 P.2d 730 (1963); *In re McInerney,* 47 Wyo. 258, 34 P.2d 35 (1934). Under the statute the district court was held to have the power to have testimony presented to it, but its sole duty was to determine whether the acts done by the board of adjustment were in excess of its power, or an unlawful abuse of that power. In the event the action of the board of adjustment which was complained of could be found to be arbitrary or the illegal exercise of its powers, then the district court could vacate, reverse, modify or correct the ruling of the board.

We previously have noted the statutory provisions relating to the supreme court's authority in connection with the procedural aspects of the review of administrative decisions. We also have noted the provisions of Rule 87(b) of the Wyoming Rules of Civil Procedure, which reach to the review procedure with respect to administrative actions. We find in the adoption of the Wyoming Administrative Procedure Act, §§ 9–4–101, et seq., W.S.1977, the strong

implication that the procedure for review under Rule 12, Wyoming Rules of Appellate Procedure, as those provisions have evolved from the Wyoming Rules of Civil Procedure, should be applicable to the review of actions denying a zoning certificate by a board of county commissioners pursuant to § 18–5–203, W.S.1977. These rules invoke the substantive standards of the Wyoming Administrative Procedure Act. In any event, the procedural aspects of such review would be governed by the Wyoming Rules of Appellate Procedure.

We then turn to the contention that this was legislative action by the Board and therefore not subject to the provisions of the Wyoming Administrative Procedure Act. The Board relies upon the decision of this court in *McGann v. City Council of the City of Laramie,* Wyo., 581 P.2d 1104 (1978), in which we held that a decision to zone or rezone an area was legislative action and not reviewable under the Wyoming Administrative Procedure Act. Given the specific language of § 18–5–203, W.S.1977, the decision of the Board in this instance denying the issuance of a development permit, which we equate with the zoning certificate under the statute, is adjudicative in nature. Nothing in the record indicates that the Board was engaged in an effort to zone or rezone, and if it was it certainly did not follow the required procedure. We also note the exclusion of governing bodies of cities and towns acting in a legislative capacity in the definition of agency that was incorporated in the statute that was applicable in *McGann v. City Council of the City of Laramie,* supra.

Finally, we have not overlooked the provisions of Rule 12.07, W.R.A.P. In pertinent part that rule provides:

" * * * The record in a contested case shall consist of the matter required by section 9–4–107(*o*), W.S.1977, of the Wyoming Administrative Procedure Act. To the extent that any matter so required was not preserved by the agency, and there is no record thereof, the court *may* take evidence of the matter. * * * " (Emphasis added.)

Section 9–4–107(*o*), W.S.1977, provides:

"*Record*—The record in a contested case must include:

"(i) All formal or informal notices, pleadings, motions, intermediate rulings;

"(ii) Evidence received or considered including matters officially noticed;

"(iii) Questions and offers of proof, objections, and rulings thereon;

"(iv) Any proposed findings and exceptions thereto;

"(v) Any opinion, findings, decision or order of the agency and any report by the officer presiding at the hearing."

The glaring deficiency of this record to include items (ii) and (iii) from this statutory provision is best appreciated by a reference to the quoted minutes of the meetings of the Board. Concededly under Rule 12.07 the district court could have taken evidence, but we recognize the wisdom of the district judge in not pursuing that option. He then would have assumed the responsibility of developing a record which, as we have held above, must be the responsibility of the Board. In so doing there would arise a danger of unconstitutional infringement upon the prerogatives of the Board because, having taken such evidence, the likelihood must be that the district court would rely upon it in its review of the proceedings before the Board. It is the Board that needs that information and, because it must follow the requirements for a contested case, it is the Board that must develop the record required by the Wyoming Administrative Procedure Act.

We therefore affirm the decision of the district court but remand this case to the district court with instructions that it should be remanded to the Board of County Commissioners of Teton County for the purpose of providing proper notice and affording a contested-case-style hearing. This treatment of the case does not result in the substitution of either this court's or the district court's judgment for that of the Board. It will result in a judicial review, in accordance with Rule 12, W.R.A.P., which is possible and meaningful.

The case is affirmed but remanded to the district court with instructions that it remand the case to the Board of County Commissioners of Teton County for further proceedings in accordance with this opinion, including the application of its contested-case procedures to the hearing before the Board.

RAPER, Justice, dissenting, with whom BROWN, Justice, joins.

I must dissent in this case because I am in total disagreement with the majority's decision to affirm the district court's remand of this matter back to the Board of County Commissioners of Teton County (Board). I must take exception with the court's view that the Board, on its own motion, must initiate a trial-type hearing after a decision to deny the permit has already been made in order that a record be made for subsequent judicial review. Any such view is unnecessary under our definition of a contested case and is extremely impractical in that it would require trial-type hearings to be held by boards of county commissioners conceivably for every zoning permit application. Such a result would be unreasonably burdensome. Although the majority chooses a different disposition on remand than the district court had ordered, I am convinced that the Board's original disposition of this matter was proper. The Board, in denying the request for a development permit made by Teton County Youth Services, Inc. (Youth Services), was in accordance with law and it was not arbitrary nor capricious in its disposition.

On February 25, 1980, Youth Services filed an application for a development permit with the Administrator of Planning Services of Teton County. Under the Teton County Comprehensive Plan and Implementation Program (Plan), which the Board had

1. Section 18–5–201, W.S.1977:
   "To promote the public health, safety, morals and general welfare of the county, each board of county commissioners may regulate and restrict the location and use of buildings and structures and the use, condition of use or occupancy of lands for residence, recreation, agriculture, industry, commerce, public use and other purposes in the unincorporated

adopted pursuant to its authority under § 18–5–201, W.S.1977,[1] this was the first step necessary to gain the Board's permission to build a residential treatment center in rural Teton County. The purpose of the treatment center was to provide law enforcement and juvenile courts with a community based correctional alternative for delinquent, status-offender, and pre-delinquent juveniles.

Before a development permit could be granted under the Plan, the developer must have received the go-ahead from both the County Planning Commission and the Board of County Commissioners. The criteria pertinent to our inquiry that these two bodies were to use in considering an application was outlined in the Plan:

"Section 8. *Required Considerations.* The following considerations shall be taken into account in the review of a development permit application by the Planning Commission and the Board of County Commissioners [in pertinent part]:

\*    \*    \*    \*    \*    \*

"e. Potential effects on fire safety.

\*    \*    \*    \*    \*    \*

"g. Potential effects on the character of the area in which the use is to be located, including possible intrusion on privacy in residential areas, and the scale and bulk of the use in relation to neighboring uses.

\*    \*    \*    \*    \*    \*

"Section 9. *Required Findings.* Before recommending or granting a development permit, the Planning Commission and the Board of County Commissioners shall make the following findings [in pertinent part]:

area of the county. However, nothing in W.S. 18–5–201 through 18–5–207 shall be construed to contravene any zoning authority of any incorporated city or town and no zoning resolution or plan shall prevent any use or occupancy reasonably necessary to the extraction or production of the mineral resources in or under any lands subject thereto."

"a. The proposed use does not conflict with goals and policies of the Comprehensive Plan.

"b. The proposed use is consistent with the Land Use Element.

"c. The proposed use will meet required performance standards.

\* \* \* \* \* \*

"g. The proposed use will not cause traffic congestion or safety hazards.

\* \* \* \* \* \*

"i. The proposed use will not have any significant adverse impact on neighboring properties that are either developed or undeveloped."

On April 7, 1980, the County Planning Commission voted to approve the application for a permit subject to certain conditions. Its findings were transmitted to the Board in accordance with the Plan.

On April 22, 1980, the Board first heard a presentation by Youth Services seeking the permit. The application was again considered on May 6 and May 20, 1980. At the meeting on the latter date, the Board voted unanimously to deny Youth Services' application. Before its vote the Board members expressed concern over the proposed site's distance from police, fire, and medical facilities as well as the fear that neighboring property would be adversely affected. In response to a request, the Board adopted specific findings of fact on June 3, 1980. Included therein were the following:

"5. That public notice of a hearing on said application before the Board of County Commissioners was published in the official County newspaper on April 10, 1980, and the matter was initially heard by the Board at a public hearing on April 22, 1980, at which time the applicant, her attorney, and members of the board of directors of the VanVleck House appeared and were heard, and statements in opposition to the permit were heard, and the Board heard from Undersheriff Roger Millward and Fire Marshall Ken Sutton, and the matter then having been tabled until the May 20, 1980 meeting in order to allow applicant to further address certain issues and to present additional supporting data to the Board.

"6. That the national standard for a fire truck to respond to a fire in an institution of the nature for which applicant seeks a development permit is seven minutes; that the minimum time in which a fire truck could reach the location of the proposed development in ideal road and weather conditions would be twenty-four minutes; that said response time would significantly be increased in times of adverse weather road conditions; that the access road to the proposed development area is subjected to heavy snowfall annually during the months of October through April; and that because of the prevailing road conditions and the distance required to be travelled Teton County would be unable to provide adequate fire protection to the proposed development; and further that the residents of the proposed development would not be there voluntarily, but rather under court order or some other means of compelling their presence and as a result thereof Teton County is under a heavy obligation to provide adequate fire protection to them, which cannot be done.

"7. That police protection to the proposed development would have to be provided by Teton County by and through the Teton County Sheriff's Department and the response time that said department would be able to provide to the proposed development would be no better than that of the fire department and would oftentimes be worse, depending upon the location of the deputy sheriff at the time he received a call for assistance at the proposed development; that Teton County would be obligated to provide such police protection to the proposed development and that it would be unable to do so satisfactorily.

"8. That response times to the proposed development for an ambulance and/or medical personnel would be greater than for the fire department and that such a response time would be unsatisfactory for the use proposed to be developed.

"9. That there would be a significant impact upon the area in which the proposed development would be located, said impact to include a significant increase in the vehicular traffic on the roads, noise, traffic congestion, and problems caused thereby resulting in a diminution of of [sic] automotive and pedestrian safety and vehicle maneuverability and further that there would be a serious impact on road maintenance and new construction.

"10. That those persons who own property in the immediate vicinity of the proposed development are nearly unanimous in their opposition to the proposed development."

The matter was appealed to the district court where Youth Services argued that the Board's findings of fact were not supported by substantial evidence and further that the decision to reject the application was arbitrary and capricious. The district court reversed saying:

"5. The decision of the Teton County Commissioners rendered May 20, 1980, and formalized into writing June 3, 1980, denying the application of appellant (by and through its agent Katie Thompson) for a zoning certificate of use: is not in accordance with law; is contrary to constitutional right and power; is in excess of statutory jurisdiction, authority and limitations, and lacking in statutory right; was entered without observance of procedure required by law as to significant underlying findings, considerations and criteria; is unsupported by substantial eveidence [sic]; and is arbitrary, capricious and characterized by an abuse of discretion."

From that decision the Board appeals.

The majority holds that the Board must follow the Administrative Procedure Act contested-case procedures pursuant to § 9–4–107, W.S.1977. The procedure must be conducted as a trial-type hearing. Upon the conclusion that there be a trial-type hearing, I must vigorously dissent. The majority would have the Board now initiate, upon its own motion, a trial-type hearing after the Board has decided to deny

Youth Services' permit application. This extraordinary solution appears to be simply for the purpose of producing a purportedly better record for any subsequent judicial review. Neither the statutes involved nor the Board's own Plan required a trial-type hearing, so the fact that none was held is of no significance. All that was required by § 18–5–203 was that the Board promptly consider the application and decide whether it complied with the requirements of its Plan, and, if the application was denied, to specify why. Section 18–5–202(c) requires the Board to hold a "public hearing." These requirements were met. No particular procedures are otherwise required.

Under the terms of the Plan the Board was required to consider and decide whether to grant the application no sooner than ten days following the receipt of the Planning Commission's approval. This was done. The Plan also required the Board to make the appropriate considerations listed elsewhere in the Plan. This too was done. As a result, the only conclusion I believe this court can reach is that the Board followed proper procedures.

The majority leaps to the conclusion that a contested-case, trial-type hearing is required. This flies in the face of the language of § 9–4–107(n), supra, which states:

"(n) *Informal disposition.*—Unless precluded by law, informal disposition may be made of any contested case by stipulation, agreed settlement, consent order, or default."

I cannot find that an informal disposition is precluded by law. A public hearing of the type conducted by the Board fits within what is termed an "informal disposition." Youth Services, it must be remembered, has never objected to the type hearing that was conducted in this matter. Its only complaint has been with the result reached by the Board. Without an objection by one of the parties, we are not in a position to assume that the informal proceeding was improperly conducted and must conclude that Youth Services, by inference, stipulated to or waived a contested-case, trial-type hearing.

The type of record produced at the Board's hearing has caused the majority an undue amount of concern. We have a sufficient record to decide this case. Section 9–4–107(*o* ), supra, sets out what the record in a contested case must include:

"(*o*) *Record.*—The record in a contested case must include:

"(i) All formal or informal notices, pleadings, motions, intermediate rulings;

"(ii) Evidence received or considered including matters officially noticed;

"(iii) Questions and offers of proof, objections, and rulings thereon;

"(iv) Any proposed findings and exceptions thereto;

"(v) Any opinion, findings, decision or order of the agency and any report by the officer presiding at the hearing."

All of those requirements have been met in the record we have before us. Section 9–4–107(p), supra, sets out how the proceeding in a contested case is to be reported:

"(p) *Reporting proceeding.*—In all contested cases the proceeding including all testimony shall be reported verbatim stenographically or by any other appropriate means determined by the agency or the officer presiding at the hearing."

The proceeding here was reported in the form of minutes by the Board's secretary. Absent any objection by one of the parties to this appeal, we cannot assume that those minutes were an inappropriate means of reporting the proceeding. I must conclude from the language of the statute that, in the absence of any objection by the parties, the record produced by the Board satisfied the procedural requirements set out for contested cases in that it represented the means determined by the Board to be appropriate.

The notion of informal proceedings in front of agencies is not a novel one. In fact, informal proceedings are the norm. Professor Schwartz has said, "[t]he great bulk of administrative decisions are made informally * * *." Schwartz, Administrative Law § 10 (1976). Even in the cases where rights protected by the Due Process Clause of the Fourteenth Amendment are involved, the United States Supreme Court has held that informal proceedings, far short of trial-type hearings, are sufficient to protect the rights involved. *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Of course, the magnitude of the interest protected is an important factor in determining whether an informal proceeding is sufficient. As I shall discuss later, there is no protected property right involved in the matter before us; nevertheless, the principle advanced in *Goss* is important because it shows how far informal proceedings have been found appropriate.

Professor Davis, in his latest treatise on administrative law, has spoken approvingly of the *Goss* principle and its applicability to the greatest portion of administrative hearings. Professor Davis states:

"American administrative law has developed by stages, with focus first on constitutional foundations, then judicial review, and then rulemaking and formal adjudication. Now that we have entered the present stage of giving attention to justice through informal action, especially when discretionary power is little controlled, the Goss principle can rapidly spread. It should." 2 Davis, Administrative Law Treatise § 13:2 (1979).

The informal proceeding contemplated in § 9–4–107(n), supra, is, then, in keeping with the progressive trend in administrative law.

There was a public hearing in this case, but the majority feels it inadequate. The public hearing before the Board allowed all of the parties interested in the outcome of Youth Services' permit application to appear and be heard. Granted there was no direct or cross-examination of speakers before the Board, there was simply the free exchange of ideas and facts which has always guaranteed that decision-making bodies have the pros and cons on the issue before them before they reach a decision. The majority fails to comprehend that the Board was a neutral and not in an adversary position before it made the decision. The adversaries, if they could be termed that, were citizens as well as departments

of government charged with fire, police and public health concerns and responsibilities with views on all sides of the issue of whether Youth Services' permit should be granted. No law or rule that I am aware of has required interested citizens, police, fire and health departments to appear in a trial-type setting, complete with counsel, prepared to meet in an adversarial struggle simply to facilitate a decision by a public body. The existence of such a rule chills the free expression of concern by citizens when matters come before their elected boards and councils for determination. Further, as I have already noted, there was no objection to the type of proceedings raised by any party either before the Board or on appeal.

I simply cannot in any way conclude that the Board should be required at this point, on its own motion, to hold a trial-type hearing. The aggrieved party, it seems, should have the burden of requesting a trial-type hearing or at least objecting to an informal proceeding conducted in lieu of a trial-type hearing.

In conclusion, I would hold that the public hearing held by the Board was sufficient to air the views of the interested parties in this matter and that no trial-type hearing need be held. The majority's disposition will create a procedural quagmire for boards of county commissioners in dealing with zoning permit applications. It is unnecessary, impractical, will undoubtedly prove to be unnecessarily costly, and will discourage full community participation in public-interest matters. In view of this conclusion, I would have decided this case as I will set out below.

This is an administrative review case; therefore, we must first acknowledge that the deference paid to a district court's decision is substantially different than in an ordinary appeal. As we have said before:

"When the district court sits as an appellate court to hear an appeal from an administrative agency, the district court is not entitled to any great deference. Indeed, in such a case the deference owed the fact finder's determination of fact

belongs to the administrative agency, not the district court. [Citation.]" (Footnote omitted.) *Wyoming Public Service Commission v. Hopkins,* Wyo., 602 P.2d 374, 377 (1979).

Thus it may be fairly said that we must review the agency's action and decide whether it is to be affirmed or reversed. After we have decided that question, we consider the district court's determination. If we agree with it, we affirm; if we disagree, we reverse. This procedure is proper because the district court's decision was one solely of law and, as such, is not entitled to a presumption of correctness, though its decisions are of great help as an aid to our own analysis and may point up some factor not apparent to the parties but a subject of judicial discernment. I do not intend to denigrate the value of an intermediate judicial study.

We must decide whether the Wyoming Administrative Procedure Act (WAPA), § 9-4-101, et seq., W.S.1977, is applicable to zoning decisions made by the Board. The majority concludes that the WAPA is applicable to this matter. I concur with the majority's conclusion in that regard but feel compelled, in reaching that conclusion, to address the specific question raised by the Board in its appeal. Under its own terms the WAPA is applicable to agencies. Section 9-4-101(b)(i), W.S.1977, 1981 Cum. Supp., defines the word agency to mean "any authority, bureau, board, commission, department, division, officer or employee of the state, a county, city or town or other political subdivision of the state, except the governing body of a city or town, the state legislature and the judiciary." The Board is a board of the county and thus is an agency within the meaning of the statute. However, the Board argues that under *McGann v. City Council of City of Laramie,* Wyo., 581 P.2d 1104 (1978), the actions it took in this case should be beyond review under the WAPA.

In *McGann* this court was presented with a case in which the city council of Laramie had amended the zoning classification of a certain parcel of land. Neighboring land

owners challenged the council's action under the WAPA. This court held that the legislature, by excluding from the definition of agencies cities or towns acting in their legislative capacity, intended to exclude them from the scope of the WAPA zoning or rezoning decisions because such was legislative in nature. *McGann, supra,* 581 P.2d at 1107.

It is my view that *McGann* is not controlling in this case. The Board's decision in denying Youth Services' application was not a decision to alter the Plan—Teton County's equivalent of a zoning ordinance. Instead it was a decision which concluded that, under the Plan, Youth Services' proposed facility did not conform with all the requirements necessary to obtain a development permit; though the line between this case and *McGann* is fuzzy and easily circumvented, we are forced by the legislature's hazy language in § 9–4–101(b)(i) to observe it. The Board's decision to deny Youth Services' application for a development permit was the act of an agency within the meaning of that term as defined in the WAPA. The Board's action does not fit within the exception. The statute's wording provides an exception for legislative enactments of a city but not a county, so it is not necessary to decide whether that distinction was valid, intended, or applies to zoning enactments by the county.

Next I will discuss the proper scope of our judicial review in accord with § 9–4–114(c), W.S.1977, 1981 Cum.Supp. That section provides:

"(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

"(i) Compel agency action unlawfully withheld or unreasonably delayed; and

"(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

"(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

"(B) Contrary to constitutional right, power, privilege or immunity;

"(C) In excess of statutory jurisdiction, authority or limitations, or lacking statutory right;

"(D) Without observance of procedure required by law; or

"(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute."

The only challenge on appeal is that the agency's actions violated § 9–4–114(c)(ii). Before proceeding to examine why the Board's action should not be set aside, it would be useful to examine the origin and scope of the Board's authority in zoning matters.

Section 18–5–202, W.S.1977, authorizes county boards of commissioners throughout the state to adopt resolutions establishing plans and procedures which effectuate the desired zoning principles. The procedure to be followed is outlined in some detail. Previous cases before this court have required county boards to comply with the procedural requirements of this statute in adopting zoning regulations. *Schoeller v. Board of County Commissioners of County of Park,* Wyo., 568 P.2d 869 (1977).

Apparently, in this case, Teton County's Plan was adopted by the Board in accord with § 18–5–202. No challenge to the Plan itself is made, but only to its application in this case. Section 18–5–203, W.S.1977, authorizes appeal of the Board's action or inaction through the district court to this court in accordance with Rule 12, W.R.A.P.

Turning back to § 9–4–114(c)(ii), supra, it can be seen that the scope of review of the Board's action is clear. First we must determine whether the Board's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Second, in light of the district court's finding that the Board's actions were contrary to constitutional right and power, we must briefly consider whether there was a constitutional breach. Third, we must examine the Board's conduct and ascertain whether it acted in excess of its statutory authority. Fourth, we must assure ourselves that proper procedure was followed.

The fifth criterion listed in § 9–4–114(c)(ii) is satisfied. The minutes of three Board meetings disclose substantial evidence to support the findings. There is nothing sparse about the record. The minutes are replete with reasons why the permit should not be granted. There was inadequate fire, police, and health facilities for the type of institution for problem children proposed, and it would have an adverse effect on the neighborhood.

From what there is before us, we cannot conclude, as the district court did, that the Board acted arbitrarily, capriciously, or in a manner which can only be characterized as an abuse of discretion. At this point, it is important to note our often-stated admonition that courts must be cautious that they do not substitute their own judgment for that of agencies entrusted with the power to act. *Shenefield v. Sheridan County School Dist. No. 1,* Wyo., 544 P.2d 870 (1976); *Sweetwater County Planning Committee for Organization of School Districts v. Hinkle,* Wyo., 493 P.2d 1050 (1972). The majority has failed to follow that admonition.

The Plan adopted by the Board required it, before granting a development certificate, to consider the "[p]otential effects on fire safety," § 8e, and the "[p]otential effects on the character of the area in which the use [will] be located * * *," § 8g. Further, before granting such a permit, the Board must find, among other things, that the existing public facilities are adequate to serve the proposed use, § 9f; the proposed use will not cause safety hazards, § 9g; and the proposed use will not have any significant adverse impact on neighboring properties, § 9i. Here the Board declined to issue a permit because, after taking into account the considerations required by § 8, it found that the residential treatment center, which would house as many as twelve juveniles, may have interferred with safety and adversely affected neighboring property. The Board had before it statements supporting its conclusions.

The majority takes the view based on its belief that the Board's Finding No. 10, discussing the opposition of neighbors, was not one of the considerations to be taken into account under the required considerations mandated by § 8 of the Plan quoted above, nor encompassed within the required findings in § 9 of the Plan. Finding No. 10 does no more than show the Board's view that the issuance of a permit to Youth Services would adversely affect neighboring property. Further, nothing in §§ 8 or 9 of the Plan precludes the Board from considering the views or making findings in regard to the views of neighboring property owners; those sections of the Plan state what, at a minimum, must be considered and included in the Board's findings. It is difficult to imagine this court holding that, where the statute requires a public hearing in the highest traditions of our form of local government, the views of any interested citizen not be considered by a neutral decision-making body like the Board.

In *Anderson v. Peden,* 30 Or.App. 1063, 569 P.2d 633 (1977), aff'd 284 Or. 313, 587 P.2d 59 (1978), the court, dealing with the denial of a conditional use permit, held that it was permissible for the local governmental agency that denied the permit to consider public sentiment in reaching its decision. When the Oregon Supreme Court affirmed the decision in *Anderson,* supra, it held, on the issue of whether public sentiment should be considered, that it was not improper to make approval of a permit application contingent on criteria beyond those required by the comprehensive plan in effect where the permit was sought. Like the Oregon Supreme Court, we should not hold public sentiment irrelevant to the decision process where the public has chosen to speak out on a permit application.

Arbitrary and capricious action by an administrative body must carry with it a connotation of heavy-handedness. It means willful, unreasonable action without consideration and in disregard of the facts and circumstances of the case, action taken without some basis which a reasonable and honest man to such action would have taken. *In re West Laramie,* Wyo., 457 P.2d 498, 502 (1969); *Indiana Civil Rights Commission v. Sutherland Lumber,* 394 N.E.2d 949 (1979). Where there is room for two opinions, action is not arbitrary and capricious even though we might believe an erroneous decision has been reached; an honest difference of opinion will not support a finding of arbitrariness and capriciousness. *In re West Laramie,* supra; *State v. Rowe,* 93 Wash.2d 277, 609 P.2d 1348, 1351 (1980). As a result, it is impossible to conclude the Board's action was arbitrary and capricious.

As we have said before, "the burden of proving arbitrary, illegal or fraudulent action is on the complainant." *Marathon Oil Co. v. Welch,* Wyo., 379 P.2d 832, 836 (1963). "This burden includes not only [a] clear presentation of this question but [also] placing evidence in the record to sustain [the complainant's] position." *Wyoming Bancorporation v. Bonham,* Wyo., 527 P.2d 432, 439 (1974). Youth Services has failed to convince me that the Board acted arbitrarily, capriciously, or in a manner which could only be characterized as an abuse of discretion.

The constitutionality of the Board's action was an issue not raised by the parties but was brought into the case by the district court judge, and by the majority's declaration that a property right protected by the Fourteenth Amendment to the United States Constitution is involved.

In Wyoming, the validity of zoning restrictions has long been recognized. The state's power to establish use restrictions has been tied to its police power. Therefore, so long as the restrictions are consistent with that power and bear "a substantial relation to the public health, safety, morals, comfort, convenience, or the general good and welfare in the proper sense," they are constitutional. *State ex rel. George v. Hull,* 65 Wyo. 251, 199 P.2d 832, 835 (1948).

In this case the Board's justification for denying Youth Services' application was found in its safety concerns as well as its fears of a detrimental impact on neighboring property. These were proper considerations and clearly come within the scope of the state's police power. Accordingly, upon the issue raised by the district court, there is no constitutional violation.

As to the constitutional issue raised by the majority, I cannot agree with the majority's bold assertion that raises this permit application to a property right requiring the protection of a trial-type hearing. There is no vested property right in a contemplated use of land subject to zoning. *Snake River Venture v. Board of County Commissioners, Teton County,* Wyo., 616 P.2d 744 (1980). Zoning regulates use of land, and by its nature interferes with rights of owners. Zoning is concerned with use, not ownership of property; property rights are not involved. 101A C.J.S. Zoning and Land Planning § 2, p. 19. The residential owners did have the right to object to having an institution for wayward children imposed upon their neighborhood. Neighboring landowners who stand to be injured more than the general public by the issuance of a permit like that of Youth Services have the right to object and be heard on the matter. *Little v. Board of County Com'rs of Flathead County,* Mont., 631 P.2d 1282 (1981). The majority cites no convincing authority for its propositions. For these reasons, I cannot agree with the majority's assertion that a protected property right is involved here.

Another determination that must be made is whether the Board acted in excess of its statutory authority. Section 18-5-201, W.S.1977 (fn. 1), provides county boards of commissioners with the power to regulate and restrict the location and use of buildings in the unincorporated areas of the county. The statute does indicate that the power was given to these county boards in order to promote public health, safety, etc. Section 18-5-202, supra, authorizes these

county boards to adopt comprehensive plans for the exercise of that power. Section 18–5–203, supra, requires builders to have the approval of the boards prior to construction of a new building. In turn, the boards are required to give the approval if the proposed building complies with the requirements of its plan.

Here the Board found that Youth Services' proposed building did not comply with the Plan. As long as that decision was not arbitrary, capricious or an abuse of discretion, it was within the Board's power. I would hold that the Board did not act in excess of its power.

For the reasons stated, the judgment of the district court should be reversed and the Board's denial of Youth Services' application should be reinstated.